**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

**No. 5:15-CR-172-2F**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **MOTION TO SUPPRESS** |
| | ) | **EVIDENCE FROM PEN REGISTERS** |
| **ANTOINE DEWAYNE MYLES,** | ) | **AND RELATED INSTRUMENTS** |
| **Defendant** | ) | |

The Defendant, Antoine Dewayne Myles, comes, by and through undersigned counsel, and, pursuant to U.S. Const., amend. IV, respectfully asks the Court to prohibit receipt in evidence at trial, hearing, or any proceeding evidence from pen registers and other devices and records more particularly described below and all evidence derived from them. In support of this request the Defendant shows the following:

## I. Background

Antoine Myles is charged with a cocaine and cocaine base (crack) conspiracy beginning in or about January 2010 and continuing up to and including the date of the indictment, May 27, 2015; one substantive count of possession with intent to distribute cocaine on October 6, 2014; a money laundering conspiracy coextensive with the alleged drug conspiracy, and eight substantive counts of money laundering. (DE-1).

In the course of the investigation from which the indictment arises, law enforcement applied for and received three successive orders

> AUTHORIZING (1) THE INSTALLATION AND USE OF A PEN
> REGISTER, A TRAP AND TRACE DEVICE, AND DIRECT
> CONNECT/DISPATCH SERVICES AND (2) AUTHORIZING RELEASE
> OF CALL DETAIL, SUBSCRIBER INFORMATION TO INCLUDE ALL
> BILLING INFORMATION ASSOCIATED WITH THE ACCOUNT
> AND/OR CELL SITE INFORMATION, PRECISION LOCATION

INFORMATION (GPS), E-911 DATA, EVDO, RIT DATA, LIVE TRACE
OR MOBILE LOCATOR SERVICE INFORMATION.[1]

For facts in support of the orders, each order relied on an application consisting of a law enforcement officer's sworn statement purporting to establish probable cause.[2]  For legal authority, each order relied on N.C. Gen. Stat. §§ 15A-262 and 263, Fed. R. Crim. P. 41(d), and 18 U.S.C. § 2703(d).[3]

The first application and order, shown in Exhibit 1, targeted phone number (910) 224-7406 during the 60-day period running from the date of the order, July 17, 2013.  The other three applications and orders, shown in Exhibits 2, 3, and 4, targeted phone number (910) 818-0376 during the 60-day periods running from the dates of the orders on March 11, May 14, and July 18, 2014.

Antoine Myles has standing to challenge the orders shown in Exhibits 1, 2, 3, and 4 because both phone numbers targeted by the applications and orders were associated with him,[4] and, therefore, he had a reasonable expectation of privacy in the information sought and acquired pursuant to the orders.  *See Rakas v. Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421, 430, 58 L. Ed. 2d 387 (1978) ("capacity to claim protection of Fourth Amendment depends . . . upon whether person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place").  The General Assembly's enactment of N.C. Gen. Stat. § 15A-261(a) demonstrates that his

---

[1] Exhibit 1:  Application and Order re (910) 224-7406 (July 17, 2013), pp. 1, 8; *see also* Exhibit 2:  Application and Order re (910) 818-0376 (March 11, 2014), pp. 1, 14; Exhibit 3:  Order and Application re (910) 818-0376 (May 14, 2014), pp. 1, 13; and Exhibit 4:  Application and Order re (910) 818-0376 (July 18, 2014), pp. 1, 12.

[2] *See* Exhibit 1, p. 4 ("sets forth the following specific and articulable facts showing that there is Probable Cause"); Exhibit 2, p. 4 (same); Exhibit 3, p. 4 (same); Exhibit 4, p. 4 (same).

[3] *See* Exhibit 1, p. 8; Exhibit 2, p. 14; Exhibit 3, p. 13; Exhibit 4, p. 12.

[4] *See* Exhibit 1, pp. 4-5 ("[Antoine] MYLES is currently and has in the past used the telephone number (910) 224-7406."), and Exhibit 5A:  Affidavit of Gary Owens, Part 1 (July 21, 2014), pp. 1, 4) (re (910) 818-0376, "This device is believed to be used by Antoine Dewayne MYLES.").

expectation of privacy in the information accessible by such investigative techniques is not only legitimate, but an expectation that society acknowledges to be reasonable, for that statute punishes as a Class 1 misdemeanor "installation or use of a pen register or trap and trace device without *first* obtaining a court order." N.C. Gen. Stat. § 15A-261(a) (emphasis added).

As will be shown below, Antoine's constitutional right to the protection of his legitimate expectation of privacy in the information sought and obtained was violated by the orders both because the court's orders did not comply with the state statute authorizing such orders and also because the applications for the orders failed to establish probable cause.

## II. Legal Requirements for Such Orders

On the authority of N.C. Gen. Stat. § 15A-263, a North Carolina superior court judge issued all four of the challenged orders upon applications, which were offered on the authority of N.C. Gen. Stat. § 15A-262. North Carolina General Statute 15A-263 only authorizes a superior court judge, *see* N.C. Gen. Stat. § 15A-262(a), to enter such orders "if the judge finds":

> (1)  That there is reasonable suspicion to believe that a felony offense, or a Class A1 or Class 1 misdemeanor has been committed;
>
> (2)  That there are reasonable grounds to suspect that the person named or described in the affidavit committed the offense, if that person is known and can be named or described; and
>
> (3)  That the results of procedures involving pen registers or trap and trace devices will be of material aid in determining whether the person named in the affidavit committed the offense.

N.C. Gen. Stat. §15A-263(a).

The orders shown in Exhibits 1, 2, 3, and 4 only include the following four findings: (a) that the applicant certified that the information likely to be obtained was "relevant to an ongoing investigation"; (b) that the applicant offered "specific and articulable facts" showing probable cause to believe that subscriber information for calls to and from the targeted number was "relevant and

material to an ongoing Criminal investigation"; (c) that the applicant offered "specific and articulable facts" showing probable cause to believe that cell site information and precise location information was "relevant and material to an ongoing Criminal investigation"; and (d) that there were "specific and articulable facts" showing probable cause to believe that subscriber information, limited to name and address, of callers to and from the targeted number was "relevant and material" to the ongoing criminal investigation.[5]

Those findings do not meet *any* of the findings required by N.C. Gen. Stat. § 15A-273(a)(1)-(3). The court did not find that there was a "reasonable suspicion to believe that a felony offense . . . ha[d] been committed"; it did not find that there were "reasonable grounds to suspect that [Antoine Myles] . . . committed the offense"; and it did not find that the "results . . . [would] be of material aid in determining whether [Antoine Myles] committed the offense." Therefore, the law did not authorize the court to enter the orders.

### III. Facts about Antoine Myles Offered in Support of Probable Cause

Not only do the four orders fail to make the findings required by law before such orders may be entered, but the following summaries show that the sworn statements in the four applications were not sufficient to support the findings that N.C. Gen. Stat. § 15A-263(a) does require.

Thus, the second required finding is that there are *reasonable grounds* to suspect that the person named in the affidavit committed the crime. N.C. Gen. Stat. § 15A-263(a)(2). A North Carolina judicial official would recognize that, under North Carolina law, "reasonable grounds to believe" is, and has long been, synonymous with "probable cause." *See, e.g., In re Moore*, ___ N.C. App. ___, ___, 758 S.E.2d 33, 36 (2014) ("reasonable grounds requirement is synonymous with probable cause"); *State v. Bradley*, 32 N.C. App. 666, 670, 233 S.E.2d 603, 606 (1977) ("whether

---

[5] *See* Exhibit 1, pp. 9, 10; Exhibit 2, pp. 15, 16; Exhibit 3, pp. 14, 15; Exhibit 4, pp. 13, 14.

Trooper Alley had reasonable grounds to believe (probable cause) that . . .").  The sworn statements

offered in support of the applications for the pen register orders fail to establish probable cause.

**A.     Application of July 17, 2013, re (910) 224-7406**

Far from setting out "specific and articulable facts," the first application offered only

conclusory statements, and its sufficiency was also undermined by material omissions and other

irregularities.  Thus, it set out the following purportedly "specific and articulable facts":

> The Cumberland County Sheriff's Office is conducting an investigation into
> a crack cocaine trafficking organization.  Pursuant to the ongoing
> investigation the subject associated with the phone number (919) 224-7406
> contained within this application is involved in the trafficking of crack
> cocaine as well as the smuggling of bulk cash proceeds derived from the sale
> and distribution of crack cocaine.  As a result of the investigation which
> includes but are not limited to, controlled buys, surveillance and multiple
> search warrants it is known that Antoine MYLES is currently and has been
> in the past a major contributor to the sale and distribution of crack cocaine in
> the Cumberland County, Harnett County and Sampson County regions of
> eastern North Carolina.  MYLES is currently and has in the past used the
> telephone number (910) 224-7406 to coordinate the sale and distribution of
> crack cocaine and the transportation of bulk currency, which are direct
> proceeds from the sale and delivery of crack cocaine.  Within the last few
> days it was discovered that the phone number contained within this order
> was calling a cellular telephone number associated with a kilogram level
> cocaine distributor within the state of North Carolina.[6]

The entire statement of purported "specific and articulable facts" is one conclusory

statement after another.  Saying that a person "is involved in" something or is and has been a "major

contributor to" an activity does not present "specific and articulable" facts.  Saying that a person has

used a targeted phone number to coordinate something illegal is not a "specific and articulable fact,"

and neither is it a "specific and articulable fact" to say that "within the last few days" the targeted

phone number was calling another number associated with a kilogram level cocaine distributor in

the state.  All are conclusions that might or might not be reasonably drawn from a given set of

---

[6] Exhibit 1, pp. 4-5.

"specific and articulable facts," but the application did not support a single one of those conclusions with any set of "specific and articulable facts." Recitation of conclusory statements does not support a finding of probable cause. *See, e.g., United States v. Wilhelm*, 80 F.3d 116, 119 (4th Cir. 1996) ("Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others.") (quoting *Illinois v. Gates*, 462 U.S. 213, 239, 103 S. Ct. 2317, 2333, 76 L. Ed. 2d 527 (1983).

Moreover, since the application consisted entirely of conclusory statements and no "specific and articulable facts" at all, it could not even have supported the lesser standard of "reasonable suspicion," which, under North Carolina law, at least, requires belief by a reasonable, cautious officer, guided by his experience and training that criminal activity is afoot "based on specific and articulable facts as well as rational inferences from those facts." *State v. Williams*, 366 N.C. 110, 116, 726 S.E.2d 161, 167 (2012) (internal quotation marks omitted). Conclusory statements are not "specific and articulable facts."

Material omissions also impair the sufficiency of the statement purporting to set forth "specific and articulable facts." One sentence told the judge,

> As a result of the investigation which includes but are not limited to, *controlled buys, surveillance and multiple search warrants* it is known that Antoine MYLES is currently and has been in the past a major contributor to the sale and distribution of crack cocaine.[7]

That claim omits material facts about the various episodes of (1) controlled buys, (2) surveillance, and (3) search warrants.

On the claim of <u>controlled buys</u>, in an application for Title III wiretap authority filed on July 21, 2014, law enforcement recited facts about approximately 25 controlled buys that had been

---

[7] Exhibit 1, p. 4 (emphasis added).

conducted from October 7, 2003, to January 5, 2012, and not one of them was a controlled buy from

Antoine Myles.[8]

On the claim of <u>search warrants</u>, in the same application for Title III wiretap authority filed

on July 21, 2014, law enforcement averred that, with respect to premises under the control and

dominion of Antoine Myles

    a.  in 2000, a handgun and 1.15 grams of crack cocaine were seized from a
search executed on September 20;

    b.  in 2001, 1.40 grams of crack cocaine were seized from a search executed
on June 15, and 15 grams of crack cocaine and two handguns were
seized from a search executed on September 25; and

    c.  in 2003, 65.90 grams of crack cocaine, 2.39 grams of crack cocaine,
339.18 grams of marijuana, $1,356 and $1,670 in US currency were
seized from searches executed on July 17.[9]

Thus, all the searches executed against premises under the control and dominion of Antoine Myles

and yielding any contraband had occurred between 10 and 13 years before the pen register

application in July 2013.

And on the claim of <u>surveillance</u>, in the same application for Title III wiretap authority filed

on July 21, 2014, law enforcement averred that on July 25, 27, 29, August 9, 22, October 11, and

November 1, of 2012, and on January 15 through 20 and July 9 through 10, 16, 18, and 24, of 2013,

law enforcement "conducted surveillance on the Lemont Webb and Antoine MYLES DTO [i.e.,

"drug trafficking organization"] in an attempt to gain further information of the inner workings of

the DTO," but they "were not able to gain any pertinent information."[10]

---

[8] *See* Exhibit 5A, pp. 34-35; Exhibit 5B: Affidavit of Gary Owens, Part 2 (July 21, 2014), pp. 3-16.

[9] *See* Exhibit 5A, pp. 30-34.

[10] *See* Exhibit 5C: Affidavit of Gary Owens, Part 3 (July 21, 2014), pp. 12-13.

In sum, the statement asserting that, as a result of investigative activities including "*controlled buys, surveillance and multiple search warrants*" it was "known [on July 17, 2013] that Antoine MYLES [was] currently involved in the trafficking of crack cocaine,"[11] omitted the material facts (a) that *not a single one* of the controlled buys had been from Antoine Myles, (b) that the only searches yielding contraband from premises under Antoine Myles's control and dominion were 10 to 13 years *before* applying for the pen register on July 17, 2013, and (c) that surveillance operations in 2012 and 2013 had not produced "any pertinent information."[12] Counsel respectfully contends that those omissions are material because, had the officer told the judicial official that none of the controlled buys had been conducted against the target of the pen register, that seizures of contraband from the target of the pen register had been 10 and more years before, and that the surveillance had not yielded any pertinent information, the application would not have been granted.

Moreover, two irregularities in the application of July 11, 2013, further impair its sufficiency: The final conclusory statement avers that "[w]ithin the last few days it was discovered that the phone number contained within this order was calling a cellular telephone number associated with a kilogram level cocaine distributor within the state of North Carolina."[13] That statement suggests that law enforcement had already made itself privy to the call records of the very phone number it was asking the court to permit it to monitor in the future. The inference that law enforcement had already engaged in the privacy-invading activity it was asking permission to engage in is confirmed by the observation that, although the application for an order authorizing law enforcement's invasion of Antoine Myles's expectation of privacy was sworn on July 17, 2013, it

---

[11] Exhibit 1, p. 4 (emphasis added).

[12] *See* Exhibit 5C, pp. 12-13.

[13] Exhibit 1, p. 5.

sought authority for such activity "for the time period of *07/02/2013* to present to include sixty (60) days from this order."[14]  Sixty days from the order on July 17, 2013, would run out to September 17, 2013.  The "time period of 07/02/2013 to present" would add an additional 15 days, but the judicial officer only had authority to authorize such an invasion of privacy "for a period not to exceed 60 days," N.C. Gen. Stat. § 263(c)(1), and the court had no authority at all to authorize the invasion retroactively.

One final irregular wrinkle in the application of July 17, 2013, appears.  At the beginning, the applicant "certifie[d] the Cumberland County Sheriff's Office is conducting a criminal investigation in reference to Illegal Gambling.  It is believed that the individual using this number could have information crucial to the investigation."[15]  Its later conclusory statements purporting to set forth "specific and articulable facts," of course, have nothing to do with "a criminal investigation in reference to Illegal Gambling."

In sum, the application is inconsistent on its face.  Its purported "specific and articulable facts" are conclusory assertions.  It makes material omissions about controlled buys, surveillance, and search warrants.  It seeks prospective authorization for a privacy-invading investigative technique, in part, on the basis of the apparent use of that very technique before its authorization, which it illegally seeks to cure with retroactive approval, extending the time period for use of the technique beyond the period authorized by law.  And it predicts usefulness for an investigation of illegal gambling and then never mentions gambling activities again.  The court should not have issued the order granting the application of July 11, 2013, and all evidence stemming from it should be excluded from Antoine Myles's trial.

---

[14] Exhibit 1, p. 1 (emphasis added).

[15] Exhibit 1, pp. 1-2.

**B.      Application of March 11, 2014, re (910) 818-0376**

The statement setting forth "specific and articulable facts showing" probable cause in the

application of March 11, 2014, was much longer than that provided in the application of July 17,

2013:  The application of March 11, 2014, covers approximately eight pages as compared with only

covering two pages in the application of July 17, 2013.  But very few of the allegations in the

application of March 11, 2014, even mention Antoine Myles.  The only detailed allegation about

Antoine Myles is the following:

> CD 2 stated he used to chill (hang out) with WEBB at WEBB's residence
> (8212 Godwin-Falcon Road).  CD 2 said they would play pool and gamble.
> CD 2 stated he would see Cleveland, Antoine MYLES and Larry Donnell
> TAYLOR at WEBB's residence, also playing pool and gambling.  CD 2 said
> "Lou" (Charles D. MCMILLIAN taught WEBB how to cook crack cocaine.
> CD 2 said he saw MCMILLIAN cook crack cocaine at WEBB's residence at
> least twice.[16]

That single, innocuous detail about Antoine playing pool and gambling at Mr. Webb's home does

nothing to establish reasonable suspicion to believe that a felony offense was being committed or

probable cause to believe that Antoine was the person committing it as required for an order under

N.C. Gen. Stat. § 15A-283(a)(1) and (2).

The remainder of the application's recitation is, once again, conclusory.  Once, it alleges that

one of "several locations" identified by "agents" as "stash houses for money and illegal narcotics" is

Antoine's residence,[17] but it does not say what agents did to "identify" Antoine's residence as a

"stash house" or when they identified it as a "stash house."  In short, the applicant just says so and

does not give the judicial officer "a substantial basis for determining the existence of probable

cause."  *Illinois v. Gates*, at 239, 103 S. Ct. at 2333, 76 L. Ed. 2d 527.

---

[16] Exhibit 2, p.9.

[17] Exhibit 2, p. 5.

Finally, four times the affidavit grammatically links Antoine to Lamont Webb with a conjunction:

- The criminal investigation of Lamont WEBB, Antoine MYLES, and Harry MYLES Sr. was first initiated in September 2000.

- The informants stated Lamont WEBB and Antoine Dewayne MYLES are head of the Drug Trafficking Organization (DTO) that supplies Cumberland County and parts of Harnett County with crack cocaine. Each informant stated WEBB and MYLES use the residence at 8206 Godwin Falcon Road to distribute small amounts of crack cocaine 24 hours a day, 7 days a week. Informants advise no single person lives in the residence at 8206 Godwin Falcon Road, there are different people selling at different times, but informants have stated all of the people selling at 8206 Godwin Falcon Road work for WEBB and MYLES.

- Informants stated WEBB and MYLES use the residence at 8212 Godwin Falcon Road to store proceeds from the sale and distribution of crack cocaine. Informants also stated there is a small shed on the curtilage of 8212 Godwin Falcon Road which is used to manufacture or "cook" crack cocaine.

- Physical surveillance conducted by law enforcement has revealed that WEBB and MYLES has [sic] an established pattern of this type of behavior.[18]

The first three of those conjunctive references to Antoine, who was the target of the privacy-invading investigative technique that officers were asking permission for, are conclusory and, once again, do not give the judicial officer "a substantial basis for determining the existence of probable cause." *Illinois v. Gates*, at 239, 103 S. Ct. at 2333, 76 L. Ed. 2d 527.

The last conjunctive reference set out above mentions "this type of behavior," and it is not clear what "this" refers to. By ordinary rules of grammar, it should refer activities in the paragraph which that sentence concludes:

> CD 2 remembered an occasion when CD 2 and approximately eight or nine (8-9) other people accompanied WEBB to Fayetteville, NC. CD 2 stated they all went to a strip club in Fayetteville and WEBB gave each person, to include CD 2, one thousand dollars ($1000.00) to spend. CD 2 said that didn't include the money WEBB spent in the club that day. CD 2 said WEBB has two (2) sisters. CD 2 said WEBB was funny about his sisters and never wanted anyone around them or where they lived. CD 2

---

[18] Exhibit 2, pp. 4, 6, 10.

said WEBB is tight with his money and doesn't spend it except on vehicles and other high dollar items. CD 2 stated WEBB has made well over one million dollars ($1,000,000.00) selling cocaine and crack cocaine in and around the Cumberland County and Harnett County areas of North Carolina. This information is corroborated through interviews with CD 1, as well as, physical surveillance. Physical surveillance conducted by law enforcement has revealed that WEBB and MYLES has [sic] an established pattern of this type of behavior.[19]

Three remarks about that paragraph are in order: First, it appears that "this type of behavior" refers to visits to strip clubs with several others, all of whom WEBB gives walking around money for the outing. That may be prodigal and unseemly, but it is not criminal, and it is not about Antoine Myles. Second, until the final sentence, the paragraph is only about WEBB. And third, the grammatical miscue of using the singular verb form *has* instead of the plural verb form *have,* as required by the plural subject *WEBB and MYLES*, suggests that, as every preceding sentence in the paragraph shows, the final assertion about a "pattern of this type of behavior" was really composed to talk about WEBB, and Antoine's name was only added as an afterthought.

In sum, the application of March 11, 2014, no more merited allowance than the application offered a year before. The application only offered allegations of non-criminal conduct and conclusory statements about Antoine, and Antoine was the person whose privacy was invaded by the order against the target phone. The court should not have issued the order granting the application of March 11, 2014, and all evidence stemming from it should be excluded from Antoine Myles's trial.

**C.      Application of May 14, 2014, re (910) 818-0376**

The statement setting forth "specific and articulable facts showing" probable cause in support of the application of May 14, 2014, repeats verbatim the statement presented in the previous

---

[19] Exhibit 2, pp. 9-10.

application from March 11, 2014.[20] Its only substantive additions to the insufficient allegations in

the application of March 11, 2014, are the following two paragraphs which were inserted just before

the final paragraph:

> Continued surveillance of WEBB and MYLES indicates no change in their daily pattern of life. Both WEBB and MYLES continue to hold leadership roles in the DTO. The residence at 8206 Godwin Falcon Road in Godwin NC shows no change in the amount of vehicular traffic coming to and leaving the residence. At all times of day and night vehicles can be seen going to the residence, staying for a short period of time (1 to 2 minutes) and then leaving the residence. This type of activity is indicative of a residence used solely for the purpose of distributing user amounts of illegal narcotics, in this case crack cocaine.

> Continued phone records analysis over the last two months has identified a possible new source of supply in the Las Vegas NV area. This confirmed a statement received from a Confidential Informant who stated WEBB and/or MYLES were traveling to the Las Vegas NV area to purchase large quantities of cocaine. Agents have also continued to identify possible coconspirators and confirm continued contact between WEBB, MYLES and known narcotics traffickers.[21]

The first of those two paragraphs inserted in the application of May 14, 2014, is just a rehash of

conclusory allegations offered two months before.

The second of those two paragraphs inserted in the application of May 14, 2014, recites

what sounds like fruit of investigation under authority of the order entered on March 11, 2014. As

already shown above, the order of March 11, 2014, was itself entered without complying with N.C.

Gen. Stat. § 15A-263(a). Moreover, as also shown above, the application for the order entered on

March 11, 2014, fell short of showing probable cause and should not have issued. The single

addition to the insufficient statement from the application of March 11, 2014, that law enforcement

had "identified a possible new source of supply in the Las Vegas NV area" together with a

---

[20] *Cp.* Exhibit 3, pp. 4-10 with Exhibit 2, pp. 4-11.

[21] Exhibit 3, pp. 9-10.

statement from a confidential informant, whose reliability is not described, that "WEBB and/or MYLES were traveling to the Las Vegas NV area to purchase large quantities of cocaine" is insufficient to justify issuance of the order. Therefore, the court should not have issued the order granting the application of May 14, 2014, and all evidence stemming from it should be excluded from Antoine Myles's trial.

**D.     Application of July 18, 2014, re (910) 818-0376**

Just as the statement setting forth "specific and articulable facts showing" probable cause in support of the application of May 14, 2014, repeated verbatim the statement presented in the previous application from March 11, 2014,[22] so also, the statement setting forth "specific and articulable facts showing" probable cause in support of the application of July 18, 2014, repeats verbatim the statement presented in the previous application from May 14, 2014,[23] inserting only an additional four paragraphs before the concluding paragraph used in the applications from March 11, May 14, and July 18, 2014.[24]

The additional four paragraphs inserted before the final concluding paragraph (finally) actually do report "specific and articulable facts" and statistics about how many times Antoine had been in phone contact with Lamont Webb during the past month—information that would surely have been fruit of the preceding order from May 14, 2014 and, therefore, fruit of an illegal and unconstitutional order, one that did not comply with N.C. Gen. Stat. § 15A-263(a)(1)-(3) and that was not supported by probable cause.

---

[22] *Cp.* Exhibit 3, pp. 4-10 with Exhibit 2, pp. 4-11.

[23] *Cp.* Exhibit 4, pp. 4-8 with Exhibit 3, pp. 4-10 with Exhibit 2, pp. 4-11.

[24] Exhibit 2, p. 11; Exhibit 3, p. 10; Exhibit 4, p. 9 (all three paragraphs opening, "In SSgt. R. Moore's experience . . ." and closing, "that may conspire with or assist the suspect").

Moreover, the "specific and articulable facts" reported negate Antoine's commission of a criminal offense. Thus,

- On June 24, 2014, a confidential source of information (CSI) unsuccessfully attempted a controlled purchase at the alleged crack house. Antoine Myles opened the door and let the CSI in where the CSI saw a man smoking a "crack pipe." The CSI asked for a "dub" (a street term for $20 worth of crack cocaine), and Antoine Myles told the CSI to "get the hell out I don't know you."[25]

- On July 1, 2014, a CSI placed a consensually recorded phone call to Antoine Myles and attempted to order an "eight ball" (a street term for 3.5 grams of cocaine), asking "You know I had asked you before about getting some soft, do you think that is possible?" Antoine asked who was calling him and the CSI explained more fully who he was, and Antoine said, "Ya." The CSI asked if he "could get a sixteenth or a ball or something like that," and Antoine said, "Let me make a few calls and ya I can do that." The CSI asked, "How long do you want me to wait to call you back, a couple hours or so?" Antoine said, "ya I will call you back in a couple of hours."[26]

The June 24, 2014, episode, as reported, showed that Antoine refused to sell any contraband to the CSI. Refusing to commit a crime does not support a finding of probable cause to believe that a person has committed or is committing a crime. And, contrary to the applicant's assertion, the July 1, 2014, episode, as reported, does not show Antoine agreeing to sell contraband. What it shows is that Antoine brushed off the CSI's offer to buy; in effect, telling the CSI, "Don't call us, we'll call you," once again refusing to commit a crime.

Indeed, it is evident that law enforcement recognized that the phone conversation had not clearly shown an agreement. Once again omitting a material fact, law enforcement elected not to tell the judicial official that about two and one half hours later, under law enforcement supervision and monitoring, the CSI made a follow-up call to Antoine, explaining, "Hey, Twan. It is [CSI]. I didn't know if you were going to call me back, or if I needed to call you back." Antoine said, "I was going to call you back and let you know." The CSI asked, "So ain't nobody got no soft, all

---

[25] *See* Exhibit 4, p. 8.

[26] *See* Exhibit 4, pp. 8-9.

they have is the hard?"  And Antoine said that no one had called him back about the soft, just the hard, but that he was going to call some more people and get it.  The CSI asked, "To get my money right how much would I need to get my money right for a ball of that."  Antoine said, "I got to talk to some people and I will call ya back."[27]

The follow-up call tried to get Antoine to accept the still un-accepted offer to buy.  The CSI made the offer more definite by specifying the quantity of "a ball," but Antoine did not respond with any term of a definite price on which he would accept the CSI's offer to buy.  Instead, he brushed-off the CSI's inquiry with another "don't call us, we'll call you" response.  Thus, once again, he refused to accept the CSI's offer and, in so doing, refused to agree to commit a crime.

In sum, the application of July 18, 2014, was impaired by all the insufficiencies that undermined the previous applications of March 11 and May 14, 2014.  The addition of a statistic about how many times Antoine and Lemont Webb had been in phone contact was a fruit of the previous illegal and unconstitutional orders.  The two additional reported episodes of June 24 and July 1 show Antoine refusing to commit invited crimes, and the application omitted the material fact that in a follow-up call later on July 1, he again refused to commit an invited crime.  Therefore, the court should not have issued the order granting the application of July 18, 2014, and all evidence stemming from it should be excluded from Antoine Myles's trial.

## IV.  Conclusion

On the basis of the preceding facts, authorities, and arguments, Antoine Myles requests relief.  First, because the four orders for pen registers on July 17, 2013, March 11, May 14, and July 18, 2014, shown in Exhibits 1, 2, 3, and 4, did not comply with their authorizing statute in that the issuing court failed to make any of the findings required by the statute authorizing such orders, the

---

[27] *See* Exhibit 5B, pp. 27-28.

orders were illegal, and all evidence derived from investigative activity pursuant to their authority should be excluded from Antoine Myles's trial. And second, because, as shown in detail above, the applications for all four orders failed to offer facts sufficient to support findings of probable cause, the orders violated Antoine's constitutional right against law enforcement invasion of his reasonable expectation of privacy upon less than probable cause.

Wherefore, the Defendant respectfully asks the Court to prohibit receipt in evidence at trial, hearing, or any proceeding evidence obtained pursuant to the orders challenged in this motion, namely:  evidence from pen registers, trap and trace devices, direct connect/dispatch services, call detail, subscriber information, including billing information and/or cell site information, precision location information (GPS), E-911 data, EVDO, RIT data, and live trace or mobile locator service information, and evidence derived therefrom, and to grant such other relief as is fair and reasonable.

Respectfully submitted, this the 22nd day of February 2016.

CHESHIRE PARKER SCHNEIDER &
BRYAN, PLLC


 /s/ John Keating Wiles

John Keating Wiles
N.C. State Bar # 22379
133 Fayetteville Street
P. O. Box 1029
Raleigh, NC 27602
(919) 833-3114 (TEL)
(919) 832-0739 (FAX)
keat.wiles@cheshirepark.com
CJA Counsel

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the above and foregoing Motion to

Suppress Evidence from Pen Registers and Related Instruments has been duly served on the

following:

> Jennifer E. Wells
> Assistant United States Attorney
> 800 Federal Building
> 310 New Bern Avenue
> Raleigh, NC 27601-1461
> jennifer.e.wells@usdoj.gov

Service was made by electronically filing the foregoing with the Clerk of Court on February 22,

2016, using the CM/ECF system which will send notification of such filing to the above.

This the 22nd day of February 2016.

<div style="margin-left:40%">

/s/ John Keating Wiles
_____
John Keating Wiles
CHESHIRE PARKER SCHNEIDER &
BRYAN, PLLC
133 Fayetteville Street
P. O. Box 1029
Raleigh, North Carolina 27602
(919) 833-3114
keat.wiles@cheshirepark.com
CJA Counsel

</div>