IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CR-172-F-2
No. 5:15-CR-172-F-6

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| ANTOINE DEWAYNE MYLES | ) | |
| RONALD DEVON PEGUES, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Before the court is defendant Antoine Dewayne Myles' ("Antoine") Motion to Suppress Intercepted Communications [DE 394] pursuant to Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure and Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. § 2510 *et seq.*[1] Defendant Ronald Devon Pegues adopted the instant motion.[2] [DE 414]. The Government responded[3] but neither defendant filed a reply. [DE 417]. For the reasons discussed below, the motion is DENIED.

## I. STATEMENT OF THE CASE

This case arises from a joint investigation by the Sheriff's Office in Cumberland County, North Carolina ("CCSO"), the CCSO Special Response Team, the Cumberland County Bureau

---

[1]  Title III provides that "[a]ny aggrieved person in any trial . . . before any court . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to [Title III] or evidence derived therefrom . . . ." 18 U.S.C. § 2510(10)(a).

[2]  In his motion to adopt, Pegues explained he received discovery materials indicating that "the government has identified intercepted conversations and communications to and from Myles's phone which it asserts are between [Antoine] Myles and Defendant Pegues." [DE 413 ¶ 7]. However, Pegues provided no analysis in support of his motion. As such, the court's discussion is guided by the arguments presented by Antoine only.

[3]  The government filed an omnibus response, which addressed the instant motion and several others filed by Antoine.

of Narcotics ("CCBN") and the Drug Enforcement Administration ("DEA") (collectively, "law enforcement") into cocaine and crack trafficking activities between 2000 and 2014 of a drug trafficking organization ("DTO") based primarily in the North Carolina cities of Godwin and Dunn.

On May 27, 2015, a grand jury returned an indictment charging Antoine, Pegues and seventeen co-defendants with multiple counts.[4] Antoine and Pegues are both charged with conspiracy to manufacture, distribute, dispense and possess with intent to distribute more than 5 kilograms or more of cocaine and 280 grams or more of cocaine base (crack), 21 U.S.C. § 846 (count one). Antoine is also charged with intent to distribute a quantity of cocaine, *id.* § 841(a)(1) (count four); conspiracy to commit money laundering, 18 U.S.C. § 1956(h) (count five); five counts of concealment of money laundering, *id.* § 1956(a)(1)(B)(i) (counts 8, 23, 26, 30-31); two counts of promotion of money laundering, *id.* § 1956(a)(1)(A)(i) (counts 32-33); and one count of transactional money laundering and aiding and abetting money laundering, *id.* §§ 2, 1957.[5]

## II. FACTUAL BACKGROUND

As pertinent to the charges and instant motion, the operative facts are summarized as follows.[6]

## A. Initial Wiretap Application for Target Telephone 1

---

[4]     Seven co-defendants have pled guilty to criminal charges. [DEs 276, 281, 325, 327, 359, 361, 376].

[5]     This case is set for arraignment and trial at the court's August 1, 2016 term of court. [DE 446].

[6]     "Where factual issues are involved in determining a motion, the court shall state its essential findings on the record." FED. R. CRIM. P. 12(e); *accord United States v. Ingram*, No. 93-5607, 1994 U.S. App. LEXIS 16015, at *11-12 (4th Cir. June 24, 1994) Of course, these factual findings are preliminary in nature, are confined solely to the instant motion, and are subject to such future modification as the subsequent development of the facts and law may require. *See United States v. Moore*, 936 F.2d 287, 288-89 (6th Cir. 1991) (citing *United States v. Prieto-Villa*, 910 F.2d 601, 610 (9th Cir. 1990)).

On July 21, 2014, upon an application and 100-page affidavit submitted by then-DEA Task Force Officer Gary Owens, Chief Judge James C. Dever, III, entered an order authorizing the interception of wire communications over Target Telephone 1 ("TT1") – a cellular phone subscribed to and used by Antoine – for a period of thirty days. In his affidavit, Officer Owens provided background information regarding the investigation of the DTO, which began in September 2000.[7] Officer Owens relayed that based on numerous investigative techniques, including pen registers, trap and trace devices, subscriber information (cell site/GPS data), toll record analysis of TT1, consensually recorded phone calls, controlled and undercover drug purchases, surveillance, search warrants and confidential sources and cooperating defendants,[8] it was discovered that Lemont Webb ("Lemont") – a co-defendant – and Antoine were the head and second in command of the DTO, respectively. Owens Aff. ¶¶ 14-15 [DE 394-1]. Other members of the DTO included (1) Larry Donnell Pearsall; (2) Harry Myles, Sr., (3) Harry Myles, Jr.; (4) Nathue Jamerson Myles; (5) Cleveland Myles; (6) Pamela Janice Myles; (7) Sophia Eaddy Myles; (8) Teneka Carrington Webb; (9) Janice Marie Smith; and (10) Chapman Dale Carroll. *Id.* ¶¶ 10, 16-20. These members, many of them related to either Antoine or Lemont, generally served either as distributors for the DTO, purchasers of the DTO's real and personal property or launderers of the DTO's drug proceeds. *Id.*

i.     2000 to 2002

Beginning in September 2000, law enforcement conducted numerous narcotic operations regarding the DTO. *Id.* ¶¶ 45-89. On September 20, 2000, law enforcement responded to a call

---

[7]     Officer Owens averred that he had been with the CCSO since 1992 and had been a task force officer for the DEA since March 2002. Owens Aff. ¶¶ 1-2. He averred further that he had specific experience and training in investigating criminal violations of the federal narcotics and money laundering laws. *Id.* ¶¶ 3-4.

[8]     *Id.* ¶¶ 27-37, 43, 51, 110, 115, 160.

for service regarding narcotic activity at a residence in Godwin where both Antoine and Lemont were then residing. A search incident to arrest yielded a handgun and approximately 1.15 grams of crack-cocaine. *Id.* ¶ 43.

Officer Owens next describes two narcotics operations occurring in 2001. First, on June 15, 2001, a confidential source of information ("CSI-1") and an undercover agent purchased approximately 1.40 grams of crack cocaine from Antoine (referred to as a "controlled purchase"). *Id.* ¶ 44. Second, on September 25, 2001, a search warrant was executed on the then-residences of Antoine and Cleveland Myles. *Id.* ¶ 45. Law enforcement seized approximately 15 grams of crack cocaine and two handguns from Antoine's residence. *Id.* No narcotic operations are identified for 2002.

ii.    2003 to 2009

In July 2003, law enforcement executed a search warrant on Antoine's then-residence, seized approximately 65.90 grams of crack cocaine and $1,356.00 and arrested Antoine. *Id.* ¶ 46. Following Antoine's incarceration,[9] law enforcement continued their investigative efforts of the DTO. During October and November 2003, CSI-2 conducted a controlled purchase of crack cocaine (.91 and 1.75 grams) from Lemont on two separate occasions. *Id.* ¶¶ 48-49. On April 27, 2004, CSI-2 purchased .57 grams of crack cocaine from Lemont. *Id.* ¶ 50. On May 4, 2004, January 12, 2005, March 23, 2006 and March 9, 2007, law enforcement executed search warrants on the mobile home located at 8206 Godwin Falcon Road (the "8206 home"). These searches resulted in the seizure of approximately 21.06 grams of crack cocaine (May 2004 and

---

[9]    On February 2, 2004, Antoine was sentenced in the U.S. District Court for the Eastern District of North Carolina to a term of 96 months imprisonment and 36 months supervised release. *Id.* ¶ 47. Antoine remained in custody until April 1, 2008. *Id.* On July 20, 2010, Antoine's supervised release was revoked and he was remanded into custody of the Federal Bureau of Prisons from June 22, 2009 until his release date of March 15, 2011. *Id.*

March 2007) and cash totaling $3,389.00. *Id.* ¶¶ 51-54. The May 2004 search resulted in the arrests of, *inter alia*, Lemont and Nathue Myles, both of whom were present at the time the search warrant was executed. *Id.* ¶ 51. Lemont was also present for the search conducted in January 2005, but was not arrested. *Id.* ¶ 52. Larry Pearsall was present for the searches conducted in March 2006 and March 2007 and was arrested following the March 2007 search. *Id.* ¶¶ 53-54.

On June 28, 2007, CSI-3 conducted a controlled purchase of approximately .24 grams of crack cocaine from Anthony Godwin at the 8206 home. A subsequent search of the premises revealed no items of evidentiary value. *Id.* ¶¶ 55-56. Godwin was present during the search. Over a year later, in August 2008, CSI-3 conducted a controlled purchase of approximately 1 gram of crack cocaine from Nathue Myles at the 8206 home. Again, a search of the premises revealed no items of evidentiary value. Both Godwin and Nathue Myles were present during the search. *Id.* ¶¶ 57-58.

The affidavit indicates only two law enforcement activities regarding the DTO in 2009. Specifically, in September, CSI-4 conducted two separate controlled purchases of crack cocaine (.37 grams and .30 grams) from Lemont at the 8206 home. *Id.* ¶¶ 59-60.

iii.    2010 to 2011

Between August and October 2010, CSI-5 conducted five separate controlled purchases of crack cocaine (approximately .72, .29, .49, .49, .37 and .70 grams) from Chapman Carroll[10] and one purchase from Wendell Clegg – all at the 8206 home. In December 2010, CSI-6 conducted one controlled purchase of approximately .43 grams from Chapman Carroll at the 8206 home. *Id.* ¶¶ 61-67. On December 3, 2010, law enforcement executed search warrants on

---

[10]    Godwin participated in the controlled purchase that occurred on September 22, 2010. *Id.* ¶ 64.

the 8206 home and the mobile home located at 8212 Godwin Falcon Road (the "8212 home") –
the residence of Lemont and Teneka Webb. Past investigative efforts revealed the DTO used the
8212 home to store proceeds from the drug sales at the 8206 home. The search of the 8206 home
resulted in the seizure of approximately .49 grams of crack cocaine and $627.00. Law
enforcement seized $5,911.00 and recovered $40.00 of photocopied law enforcement "buy
money" from the 8212 home. *Id.* ¶ 68.

On December 13, 2010, CSI-7 conducted a controlled purchase of approximately .32
grams of crack cocaine from an unidentified male at the 8206 home. *Id.* ¶ 69. Two days later,
law enforcement again executed search warrants on the 8206 and 8212 homes. The search of the
8206 home – for which Lemont was present – resulted in the seizure of approximately 6.97
grams of crack cocaine and $416.00 and in Lemont's arrest. *Id.* ¶ 70. The search of the 8212
home resulted in the seizure of $3,294.00. *Id.*

Between January and December 2011, CSI-7 conducted eight controlled purchases of
crack cocaine (approximately .44, .18, .33, .25, .42, .31, .38 and .58 grams) at the 8206 home.
With the exception of the December 2011 purchase from Lemont, all purchases were from an
unidentified male. *Id.* ¶¶ 71, 73, 75, 77, 79, 81, 83, 85. Law enforcement executed searches on
the 8206 home shortly after the first seven purchases. *Id.* ¶¶ 72, 74, 76, 78, 80, 82, 84. As a
result of these searches, law enforcement seized .34 and .58 grams of crack cocaine (June 29,
2011 and December 9, 2011), a crack pipe (August 19, 2011) and cash totaling $1,401.00
($718.00, $406.00, $115.00, $120.00, $42.00). *Id.* ¶¶ 72, 74, 80, 82, 84. Two of the searches
also included the 8212 home, from which law enforcement seized only $4.00 (January 21, 2011).
*Id.* ¶¶ 74, 76. Finally, one search included the mobile home located at 8189 Godwin Falcon
Road (the "8189 home") – the home from which Chapman Carroll transported narcotics to the

8206 home. *Id.* ¶¶ 74, 76, 78. No items of evidentiary value were located in the 8189 home. *Id.*
¶ 78.

iv.  2012 to 2014

Between January 12, 2012 and June 24, 2014, investigative efforts continued, including
25 surveillance operations, the issuance of 13 grand jury subpoenas to various financial
institutions, the use of pen registers and GPS tracking and collection of subpoenaed toll records.
*Id.* ¶¶ 87, 139-145. The surveillance operations during this time period, however, were generally
unsuccessful as a result of "aggressive counter-surveillance and apparent detection of the
surveillance teams . . . ." *Id.* ¶¶ 87, 139-145.

Officer Owens described three consensually recorded phone calls during this time. First,
on April 29, 2014, CSI-8 called Antoine on TT1. *Id.* ¶ 103. CSI-8 attempted to order
approximately a quarter ounce of cocaine, asking Antoine, "Are you good?" to which Antoine
responded, "Na not right now." [11] The conversation ended with Antoine agreeing to call CSI-8
when Antoine was "good." *Id.*

Second, on July 1, 2014, CSI-7 placed two consensually recorded phone calls to Antoine
Myles on TT1. During the first call, CSI-7 asked if he could "get a sixteenth or a ball or
something" of powder cocaine. *Id.* ¶ 105. Antoine responded, "Let me make a few calls and ya I
can do that," and then advised he would call CSI-7 "in a couple of hours." *Id.* Later that day,
CSI-7 placed a follow-up call to Antoine Myles. *Id.* ¶ 106. Antoine advised that "no one had
called him back about the soft [powder cocaine], just the hard [crack cocaine], but that he was
going to call some more people and get it." *Id.* ¶ 106.

Also, Officer Owens described three controlled purchase attempts during this period.

---

[11]     Owens averred that based on his training and experience investigating narcotics offenses, narcotics
traffickers use the term "good" when advising customers of the availability of drugs. *Id.* ¶ 103.

First, on January 12, 2012, CSI-7 conducted a controlled purchase of approximately .67 grams of crack cocaine from Lemont at the 8206 home. *Id.* ¶ 86. Over two years later, on June 24, 2014, CSI-12 attempted a controlled purchase of a "dub" (i.e., $20 worth of crack cocaine) from Antoine at the 8206 home. *Id.* ¶ 88. Antoine, however, ordered CSI-12 to "get the hell out. I don't know you." *Id.* The next day, however, CSI-7 conducted a controlled purchase of .20 grams of crack cocaine from Larry Pearsall at the 8206 home. *Id.* ¶ 89.

Finally, Officer Owens provided toll record data for June 2, 2014 through July 2, 2014. This data that 4,061 of the 6,504 calls to and from TT1 were known narcotics distributors or associates thereof. *Id.* ¶ 111. The data also revealed approximately 554, 171 and 199 phone calls to or from the cell phones of Lemont, Larry Pearsall and Nathue Myles, respectively. *Id.* ¶ 112.

v.   Other informants

In support of his application, Officer Owens also relayed that law enforcement gathered information about the DTO through interviews of and statements provided by two cooperating defendants ("CD") and three additional CSIs (CSI-9, CSI-10 and CSI-11). *Id.* ¶ 90-99.

With respect to the CDs, both sold cocaine to Lemont in the past. CD-1 began selling cocaine to Lemont in 2003, initially selling two ounces of powder cocaine once a week every week until "early 2005," at which point CD-1 began selling Lemont nine ounces of powder cocaine every two weeks until October 2012. *Id.* ¶ 91. In September 2008, CD-2 sold Lemont nine ounces of crack cocaine at $1000.00 per ounce. *Id.* ¶ 93. Lemont typically purchased 4½ ounces of cocaine (half in crack cocaine and half in powder cocaine) at $1,000.00 per ounce from CD-2 between January 2009 and March 2010 "on a regular basis." *Id.* ¶ 94. On a few occasions, Lemont purchased nine ounces of cocaine from CD-2. *Id.* The narcotics transactions

between CD-2 and Lemont occurred either at the 8212 home (Lemont's residence), on a highway in Dunn, North Carolina or on Bears Lane in Dunn – the street on which Antoine resided. *Id.*

CD-2 also informed law enforcement that Lemont learned to cook cocaine from Charles D. McMillian, who CD-2 observed cooking crack cocaine at the 8212 home on at least two occasions. *Id.* ¶ 96. CD-2 characterized the 8206 – located directly beside Lemont's residence – as a "trap house" (i.e., a house used for the sole purpose of distributing crack cocaine) that operated 24 hours a day. *Id.* ¶ 97. According to CD-2, Lemont made "well over one million dollars" selling cocaine and crack cocaine in and around the Cumberland County and Harnett County areas of North Carolina. *Id.* ¶ 98.

Officer Owens averred that interviews with CSI-9, CSI-10 and CSI-11 "over the last three years" revealed the following information: (1) the distribution of crack cocaine from and the storage of drug proceeds at the mobile homes located at 8189, 8201, 8206 and 8212 Godwin Falcon Road; (2) the manufacturing of crack in a shed located at 8212 Godwin Falcon Road; (3) Lemont and Antoine were the "heads" of the DTO supplying crack cocaine to the North Carolina counties of Cumberland, Harnett and Sampson; (4) the use of the 8206 home by both Lemont and Antoine to distribute crack cocaine 24 hours a day and seven days a week; and (5) all persons selling out of the 8206 home work for Lemont and Antoine. *Id.* ¶¶ 99-101.

Based on these facts, Officer Owens advised that the interception of TT1 was necessary in order to accomplish the goals of the investigation – identifying members of the DTO and the means and methods used thereby to obtain and distribute cocaine and crack cocaine in the Eastern District of North Carolina. *Id.* ¶ 114. He then explained that while the use of traditional investigative techniques, including search warrants, toll information for TT1, physical surveillance, controlled and undercover purchases, consensual monitoring, confidential sources

and grand jury subpoenas, had yielded some information, they were "unhelpful in determining the scope of the DTO's dealings outside of Antoine Myles' personal dealings with his customers, his personal narcotics distribution habits and information which can be gleaned directly from Antoine Myles through direct contact and meetings." *Id.* ¶ 115. Finally, Officer Owens averred that the government would conduct the wiretap so as to minimize the interception of communications on TT1. *Id.* ¶ 168.

**B.      Application for First Extension of Wiretap of TT1 & for Initial Wiretap of TT2**

On August 21, 2014, upon an application and 140-page affidavit submitted by Officer Owens, Judge Dever entered an order authorizing (1) the extension of the interception of wire communications over TT1 and (2) the interception of wire communications over TT2 – a cellular phone subscribed to and used by Lemont – for a period of thirty days.

i.      Extension of TT1 Wiretap

In addition to including much of the information provided in his affidavit in support of the initial application for the wiretap of TT1, Officer Owens described in detail information obtained as a result of the interception of communications on TT1 from July 23, 2014 through August 22, 2014. Specifically, he explained that the intercepted communications confirmed that TT1 was being used as a contact for DTO. He also described conversations, calls and texts made between TT1 and various individuals, including John Bernard Taylor and Farrah Michelle Harrell – both believed to be suppliers of cocaine to the DTO – which assisted law enforcement "with identifying locations of drugs and drug proceeds and their methods of concealment" by the DTO. Owens 2d Aff. ¶¶ 109-110, 164. For example, intercepted communications revealed Antoine "purchase[d] cocaine from multiple sources known and unknown located in different areas of North Carolina and w[ould] continue to purchase cocaine from those sources known and

unknown in North Carolina." *Id.* ¶ 191. Additionally, intercepted conversations also "verified the DTO's ties to Durham, North Carolina and Raleigh, North Carolina." *Id.* ¶¶ 81, 191.

ii.     Initial Wiretap of TT2

In support of his request for interception of wire communications over TT2, Officer Owens explained in detail the relationship between TT1 and TT2 used to support the DTO's activities. Specifically, he explained that between July 5, 2014 and August 5, 2014, toll record data analysis indicated TT2 was used to make or receive numerous calls from three different unidentified persons, each of whom had engaged in intercepted conversations regarding cocaine transactions with Antoine. *Id.* ¶¶ 132-33. During this time, TT1 also had contact with TT2 on three separate occasions. *Id.* ¶¶ 134-39. Based on Officer Owen's information and belief, these intercepted conversations concerned the sale of 200 grams of cocaine out of the 8206 home, Antoine's request for more powder cocaine, and Lemont's retrieval of 1000 grams of cocaine from underneath a vehicle owned by Antoine with instructions to sell the cocaine at $1,300.00 per ounce. *Id.* ¶¶ 136-37, 139, 164-65.

iii.    Justification for first extension of wiretap of TT1 and initial wiretap of TT2

Based on the additional information obtained as a result of the intercepted communications on TT1, Officer Owens advised continued monitoring of TT1 along with the initial interception of wire communications of TT2 was necessary "to identify [other] sources of supply and to assist in the seizure of illegal drugs and drug proceeds." *Id.* ¶ 141. In particular, he explained the requested wiretaps would allow law enforcement "to identify common sources of supply between" TT1 and TT2 as law enforcement believed Antoine and Lemont each had sources of supply "separate and apart from their shared sources of supply." *Id.* ¶ 191. Additionally, he explained that traditional investigative techniques "have been unhelpful in

determining the scope of the DTO's dealings outside of Antoine Myles' and Lemont Webbs' [sic] personal dealings with their customers, their personal narcotics distribution patterns, and information which can be gleaned directly from Antoine Myles and Lemont Webb through direct contact and meetings." *Id.* ¶¶ 141-42. As such, explained Officer Owens, these techniques would not enable law enforcement to achieve the goals of the investigation. *Id.*

C.  **Application for Second Extension of Wiretap of TT1 & for First Extension of Wiretap of TT2**

On September 29, 2014, upon an application and 107-page affidavit submitted by Officer Owens, Judge Dever entered an order authorizing (1) the second extension of the interception of wire communications over TT1 and (2) the first extension of the interception of wire communications over TT2. Again, the order authorized surveillance for a period of thirty days.

In addition to including some of the information provided in his two prior affidavits, Officer Owens included in his third affidavit information obtained as a result of further intercepted communications on TT1 and initial intercept communications on TT2 from August 22, 2014 through September 20, 2014. Specifically, he explained the intercepted communications confirmed that both TT1 and TT2 were still being used as contact phones for the DTO. For example, as to TT1, Officer Owens described a conversation made between TT1 and Harrell, who allegedly supplied Antoine with cocaine and served as a "middle man" between Antoine and Harrell's source of supply. Owens 3d Aff. ¶¶ 62-63. Officer Owens also described two conversations between TT1 and Major Clark Jr. believed to concern Antoine's attempts to purchase $13,000.00 and $21,000.00 worth of cocaine from Clark's source of supply. *Id.* ¶¶ 60-67, 70-71. He stated further that through the interception of TT1, law enforcement identified Clark as a possible "mule" for Stefan Milen, a source of supply from Raleigh, North Carolina. *Id.* ¶ 107. Officer Owens also described a conversation between TT1 and an unknown male,

during which Antoine supposedly inquired about the purchase of twelve ounces of powder cocaine from the unknown male's source of supply. *Id.* ¶¶ 76-77.

Moreover, Officer Owens describes two conversations – the first between TT1 and Lemont and the second between TT1 and Cleveland Myles – during which frustration is expressed with relying on middle men. *Id.* ¶¶ 72, 74-75. Finally, he identified incriminating text messages to TT1 from Nathue Myles and from Harrell. The two texts from Nathue were believed to be reports as to the amount of money made during two separate shifts at the 8206 home. *Id.* ¶¶ 81-82, 87-88. The three texts from Harrell were believed to concern Antoine's cocaine re-supply needs. *Id.* ¶¶ 79-80, 83-84, 86-87.

As to TT2, Officer Owens described communications between TT2 and others, including Carlos Carmelo, Janice Smith and Nathue Myles, all believed to be associated with distribution of crack cocaine from the 8206 home. *Id.* ¶¶ 92-95,102-03. He also described a call Lemont placed to his juvenile daughter, during which he asked her to count money kept in his nightstand. Officer Owens explained that based on prior search warrants of Lemont's residence, it was believed that Lemont stored illegal drug proceeds in the nightstand. *Id.* ¶¶ 100-01. Additionally, he described a call between TT1 and Carl Davis, who was believed to be inquiring as to whether Lemont had any cocaine. *Id.* ¶¶ 96-97. Finally, Officer described a call from an unknown male, advising he had cocaine ready for Lemont or Antoine to pick up. *Id.* ¶¶ 90-91.[12]

Based on the additional information obtained as a result of the intercepted communications on TT1 and TT2, Officer Owens advised continued monitoring of both was "necessary to continue to identify sources of supply and to assist in the seizure of illegal drugs and drug proceeds." *Id.* ¶ 105.

---

[12] This information was duplicated at paragraphs 98 and 99.

## III.    APPLICABLE LAW

Title III regulates the interception of wire, electronic and oral communications, which is otherwise a felony, 18 U.S.C. § 2511.[13] The procedure to intercept such communications appears in 18 U.S.C. § 2518. Under Title III, a judge may authorize a wiretap by law enforcement officers provided the application and the court order authorizing the interception include certain specific information. *Id.* § 2518(1), (4). Title III specifies what information the application must contain. *Id.* § 2518(1)(a)-(f).[14] Wiretap orders authorize a maximum surveillance period of 30 days which begins to run no later than 10 days after the order is entered. 18 U.S.C. § 2518(5).

To authorize a wiretap, a court must determine, on the basis of facts submitted by the applicant, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(3)(c). The court must also determine that there is probable cause to believe (1) an individual was committing, had committed, or is about to commit a particular offense enumerated in 18 U.S.C. § 2516;[15] (2) communications concerning that crime will be obtained through the wiretap; and (3) "the

---

[13]    "The purpose of [Title III] is to permit the use of wiretaps as an investigative technique in combatting inherently serious crimes and those typically involving elements of organized crime." *United States v. Frederickson*, 581 F.2d 711, 715 (8th Cir. 1978).

[14]    Generally, an applicant must set forth: (a) the names and identities of the law enforcement officers making and authorizing the application; (b) "a full and complete statement of the facts and circumstances relied upon by the applicant, to justify . . . that an order should be issued;" (c) "a full and complete statement as to whether . . . other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;" (d) the length of time for which the interception of communication is required; (e) "a full and complete statement of the facts concerning all previous applications known;" and (f) "where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception." 18 U.S.C. § 2518(1). The applications at issue here met the requirements of § 2518(1).

[15]    Such offenses include "any offense involving . . . the manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic drugs, marihuana, or other dangerous drugs, punishable under any law of the United States," as alleged here. 18 U.S.C. § 2516(1)(e).

facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person." 18 U.S.C. § 2518(3).

"The probable cause required for issuance of a wiretap order is the same as that which is necessary to obtain the issuance of a search warrant." *United States v. Eccleston*, 615 F. App'x 767, 779 (4th Cir. 2015); *accord United States v. Miller*, 50 F. Supp. 3d 717, 724 (D. Md. 2014). Probable cause exists where, "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "Probable cause is a practical, common-sense question that is to be resolved by determining those probabilities based upon the totality-of-the-circumstances presented in each individual case." *United States v. Stephens*, No. 2:14-CR-01, 2014 U.S. Dist. LEXIS 139151, at *7 (W.D. Va. Oct. 1, 2014).

"The availability of suppression for statutory violations, as opposed to constitutional violations, turns on provisions of the wiretap statute 'rather than the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights.'" *United States v. Owen*, No. 91-5458, 1992 U.S. App. LEXIS 14265, at *3 (4th Cir. June 17, 1992) (quoting *United States v. Donovan*, 429 U.S. 413, 432-33 n.22 (1977)). Wiretap evidence and its fruits may be suppressed on the following grounds: "(i) the communication was unlawfully intercepted; (ii) the [wiretap] order . . . is insufficient on its face; or (iii) the interception was not made in conformity with the [wiretap] order . . . ." [16] 18 U.S.C. § 2518(10)(a). In such instances,

---

[16] A person seeking to enforce § 2515 must have Title III "standing," *see In re Evans*, 452 F.2d 1239, 1244 (D.C. Cir. 1971), which Title III defines as "[a]ny aggrieved person in any trial, hearing, or proceeding," 18 U.S.C. § 2518(10)(a). The Government does not raise the issue of standing in its response, and does not dispute that both

"no part of the contents of [the intercepted] communication and no evidence derived therefrom may be received in evidence . . . ." 18 U.S.C. § 2515.

There is a "presumption of validity" for wiretaps that have issued. *United States v. Errera*, 616 F. Supp. 1145, 1149 (D. Md. 1985); *see United States v. Concepcion*, 579 F.3d 214, 217 (2d Cir. 2009) (the reviewing court must ensure only that "the facts set forth in the application were minimally adequate" to support the granting of the wiretap). Indeed, "the fact that the issuing judge found probable cause is itself a substantial factor tending to uphold the validity of the order so issued." *Errera,* 616 F. Supp. at 1149 (quoting *United States v. Becker*, 334 F. Supp. 546, 549 (S.D.N.Y.1971)); *see United States v. DePew*, 932 F.2d 324, 327 (4th Cir. 1991) (explaining "[g]reat deference is normally paid" to the determination of the issuing judge, who is "in the best position to determine if probable cause has been established in light of the circumstances as they appear at the time"). "[T]he burden is on defendant to show illegality in connection with the issuance of the wiretap order." *Miller*, 50 F. Supp. 3d at 725 (citing *United States v. Matlock*, 415 U.S. 164, 177 (1974)).

## IV.    DISCUSSION

Antoine and Pegues seek to suppress the evidence recovered by the government through its authorized wiretap application of Antoine's cell phone (TT1) during July 23, 2014 through August 22, 2014 pursuant to § 2518(10)(a)(i) (i.e., the communication was unlawfully intercepted) because the application lacked probable cause.[17] This is so, argues Antoine, because

---

Antoine and Pegues have standing to seek suppression of the evidence. An "aggrieved person" is defined as a person who was a target of the wiretap or a person party to a wiretap intercept. *Id.* § 2510(11). Antoine was listed as a target of the wiretap application. According to Pegues, discovery produced by the Government includes intercepted conversations and communications to which Pegues is a party. *See* Pegues' Mot. ¶ 7 [DE 413]. Accordingly, Antoine and Pegues qualify as "aggrieved person[s]" and thus have standing.

[17]    Antoine does not contest the facial sufficiency of the wiretap orders nor whether the interception conformed to the wiretap orders. Rather, he implicitly argues that the wiretap evidence should be suppressed

the information on which Officer Owens relied was too remote in time, rendering the evidence stale. In particular, Antoine argues the crucial information supporting the Government's initial wiretap application concerned four events that took place in 2000 through 2001. Antoine contends the only current information offered at the time of the initial wiretap application consisted of the following: (1) CSI-8's unsuccessful attempt to order cocaine from Antoine on April 29, 2014; (2) CSI-12's unsuccessful controlled purchase of a "dub" from Antoine on June 24, 2014; and (3) CSI-7's unsuccessful attempt to order an "eight ball" from Antoine on July 1, 2014. Antoine argues further that evidence derived from the August 21, 2014 and September 29, 2014 wiretap orders should also be suppressed because those interceptions were "obtained under the authority of the initial [wiretap] order."

While the age of the information supporting a wiretap application is a factor in determining probable cause, it alone does not determine staleness. Rather, whether information submitted in support of a wiretap order is stale is an issue that is decided on the peculiar facts of each case. *Sgro v. United States*, 287 U.S. 206, 210-11 (1932); *United States v. Brewer*, 204 F. App'x 205, 207 (4th Cir. 2006).[18] Indeed, also relevant are "the reliability of the sources of information, the nature of the alleged illegal activity, the duration of that activity in the location in question, and the nature of the evidence being sought." *United States v. McGrath*, 622 F.2d 36, 42 (2d Cir. 1980); *accord Brewer*, 204 F. App'x at 207 (explaining the court must "look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged [and] the length of the activity . . . .").

---

because the communication was unlawfully intercepted. Accordingly, the court's analysis is limited to the consideration of § 2518(10)(a)(i).

[18]   *See also United States v. Webster*, 473 F. Supp. 586, 596 (D. Md. 1979) (explaining staleness "cannot be determined by any rigid time rule but instead must depend on a case-by-case analysis"); *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972) ("[T]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts relied upon and the issuance of the affidavit.").

When the affidavit describes a continuing course of illegal conduct, the passage of time between the last described act and the application for the warrant becomes less significant." *United States v. Feola*, 651 F. Supp. 1068, 1090 (S.D.N.Y. 1987). Accordingly, "courts traditionally allow a fairly long period of time to elapse between information and [the issuance of a warrant or wiretap order] in cases where the evidence shows a long-standing, on-going pattern of criminal activity." *United States v. Degaule*, 797 F. Supp. 2d 1332, 1356 (N.D. Ga. 2011); *see Brewer*, 204 F. App'x at 208 (explaining "[t]he ongoing nature of the drug trafficking operation rendered the recency of the information in the affidavit less crucial, and suggested that probable cause was not diminished solely by the passage of time") (internal brackets and citations omitted). As the Fifth Circuit Court of Appeals observed, the passage of time "is even more defensible in wiretap cases than in ordinary search warrant cases, since no tangible objects which can be quickly carried off are sought." *United States v. Hyde*, 574 F.2d 856, 865 (5th Cir. 1978).

Here, given the nature and specificity of the information in the affidavits, the court finds that there was probable cause to grant the three wiretap applications. The information contained in the initial affidavit had not become impermissibly stale by the time the first wiretap order was issued. The Government's theory is not that the DTO has only recently begun dealing in illegal drugs: it is that it has been doing so, on a systematic and ongoing basis, as continuous as Antoine's and Lemont's respective incarcerations permitted. Indeed, the affidavit provides a continuing series of incidents over many years involving either the sale, manufacture or distribution of crack cocaine that are all connected in one form or another to Antoine, Lemont, their distributors and the various mobile homes located on Godwin Falcon Road. As the Fourth Circuit observed:

> When law enforcement officials are confronted with large, far-flung and on-going criminal activity involving multiple parties, they are afforded greater latitude in

> conducting wiretaps. . . . In fact, the legitimate investigation of conspiracies may necessitate the interception of all or almost all communications over a given period of time.

*United States v. Clerkley*, 556 F.2d 709, 716-17 (4th Cir. 1977); *see United States v. Quintana*, 508 F.2d 867 (7th Cir. 1975) (acknowledging the importance of interception where a "[l]arge and sophisticated narcotics" conspiracy exists and noting "the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of the far-flung conspirators and to delineate the contours of the conspiracy"). As Officer Owens indicated, the goal of wiretap surveillance was not to just identify members of the DTO, but to also determine the means and methods used thereby to obtain and distribute cocaine and crack cocaine in the Eastern District of North Carolina and elsewhere and to identify the DTO's sources of supply.

Moreover, in focusing on information from select years, Antoine conveniently ignores the more recent inculpatory information enumerated in the initial affidavit. That affidavit provided, for example, information learned from three CSIs between 2012 and 2014 regarding the DTO's structure, including Antoine's leadership role in the DTO, and Antoine's use of the 8206 home as the DTO's operation base for crack cocaine distribution. The affidavit described also numerous instances of both recent and continuing use of TT1 to conduct illegal drug transactions. For instance, less than two months before the initial wiretap application, law enforcement learned that the majority of calls to and from TT1 were known narcotics distributors or associates thereof.

Antoine's arguments fail to overcome the high level of deference owed to Judge Dever's probable cause determination. Such drug trafficking conspiracies as that set forth in the affidavit are "*the very paradigm of the continuing enterprises for which the courts have relaxed the*

*temporal requirements of non-staleness.* Indeed, if a criminal enterprise is appropriately extended, information can remain fresh for probable cause purposes *for years.*" *Feola*, 651 F. Supp. at 1090-91 (emphasis added). Here, viewing the evidence as a whole, the application portrays a single continuing course of criminal activity, extending well over fourteen years. *See, e.g.*, *United States v. Spikes*, 158 F.3d 913, 924 (6th Cir. 1998) (finding information in affidavit was not stale because it described "the manufacture and trafficking of crack cocaine over a four-year period of time"). Furthermore, to the extent the information in the affidavit from 2000 and 2001 could be considered stale, the more recent events related therein refreshed this otherwise stale information. *See United States v. Rubio*, 535 F. App'x 251, 255 (4th Cir. 2013) ("Where recent information corroborates otherwise stale information, probable cause may be found.") (quoting *Emery v. Holmes*, 824 F.2d 143, 149 (1st Cir. 1987)). Accordingly, the court finds Officer Owens' initial affidavit and subsequent affidavits demonstrated probable cause to support the authorization of the initial and continuing wiretaps by Judge Dever.

In any event, Antoine fails to offer any evidence to suggest that Officer Owens did not rely upon the wiretap applications in good faith. *See Brewer*, 204 F. App'x at 208 (holding the good faith exception to the Fourth Amendment exclusionary rule, as articulated in *United States v. Leon*, 468 U.S. 897 (1984), applies in the Title III context); *see, e.g.*, *Miller*, 50 F. Supp. 3d at 729 (finding "law enforcement officers were entitled to rely on facially valid wiretap orders").[19] No credible evidence exists that Judge Dever was knowingly misled or wholly abandoned his judicial role. *See Leon*, 468 U.S. at 923. Nor were the affidavits so facially deficient or so lacking in probable cause that reliance upon the wiretap orders was unreasonable. *Id.*

---

[19] The First, Eighth and Eleventh Circuits have held the same, *see United States v. Lomeli*, 676 F.3d 734, 742 (8th Cir. 2012) (citing *United States* v. Moore, 41 F.3d 370, 376 (8th Cir. 1994)); *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988); *United States v. Vest*, 842 F.2d 1319, 1334 (1st Cir. 1988), while the Sixth Circuit has held to the contrary, *see United States v. Rice*, 478 F.3d 704, 711-12 (6th Cir. 2007).

## V.    CONCLUSION

For the foregoing reasons, Antoine Myles' motion to suppress the Title III wiretap intercepts [DE 394] – adopted by Ronald Devon Pegues [DE 414] – is DENIED.

SO ORDERED.

This the 25th day of April, 2016.

**JAMES C. FOX**
Senior United States District Judge