IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CR-172-F-2

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| ANTOINE DEWAYNE MYLES, ) | |
| ) | |
| Defendant. ) | |

Before the court is Antoine Dewayne Myles' Motion to Suppress Evidence from Pen Registers and Related Instruments [DE 393] pursuant to Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure. In particular, Defendant challenges phone and cell cite records obtained pursuant to state court orders issued on July 17, 2013, March 11, 2014, May 14, 2014 and July 18, 2014. The Government responded[1] but Defendant did not reply. [DE 417]. For the reasons discussed below, the motion is denied.

## I. STATEMENT OF THE CASE

This case arises from a joint investigation by the Sheriff's Office in Cumberland County, North Carolina ("CCSO"), the CCSO Special Response Team, the Cumberland County Bureau of Narcotics ("CCBN") and the Drug Enforcement Administration ("DEA") into cocaine and crack trafficking activities between 2000 and 2014 of a drug trafficking organization ("DTO") based primarily in the North Carolina cities of Godwin and Dunn.

---

[1] The government filed an omnibus response, which addressed the instant motion and several others filed by Defendant.

On May 27, 2015, a grand jury returned an indictment charging Defendant and eighteen co-defendants with multiple counts.[2] Defendant is charged with (1) conspiracy to manufacture, distribute, dispense and possess with intent to distribute more than 5 kilograms or more of cocaine and 280 grams or more of cocaine base (crack), 21 U.S.C. § 846 (count one); (2) intent to distribute a quantity of cocaine, *id.* § 841(a)(1) (count four); (3) conspiracy to commit money laundering, 18 U.S.C. § 1956(h) (count five); (4) five counts of concealment of money laundering, *id.* § 1956(a)(1)(B)(i) (counts 8, 23, 26, 30-31); (6) two counts of promotion of money laundering, *id.* § 1956(a)(1)(A)(i) (counts 32-33); and (7) one count of transactional money laundering and aiding and abetting money laundering, *id.* §§ 2, 1957.[3]

## II. FACTUAL BACKGROUND

On four separate occasions, a superior court judge in Cumberland County, North Carolina issued orders authorizing the installation and use of pen registers and trap-and-trace devices ("pen/trap device") and "direct connect/dispatch services" and the disclosure of subscriber, cell site and call detail information and GPS and E911 location information for two cellular telephone numbers registered in Defendant's name ("pen/trap orders"). Each order allowed law enforcement to obtain and inspect Defendant's historical and real-time (or prospective) cell cite information. The pen/trap orders were issued pursuant to the Stored Communications Act ("SCA"), 18 U.S.C. § 2703, Rule 41(d) of the Federal Rules of Civil Procedure, and N.C. Gen. Stat. §§ 15A-262, 263. These orders were supported by the applications of Officer Roger Moore of the Cumberland County Sheriff's Office ("CCSO"). Officer Moore submitted the orders to Verizon Wireless, the cellular phone service provider and holder of the account associated with

---

[2] Seven co-defendants pled guilty to criminal charges. [DEs 276, 281, 325, 327, 359, 361, 376].

[3] This case is set for arraignment and trial at the court's August 1, 2016 term of court. [DE 446].

the two phone numbers.

## A. July 17, 2013 Application & Pen/Trap Order

On July 17, 2013, upon an application submitted by Officer Moore, a state court judge entered an order authorizing the CCSO to install and use a pen/trap device for the collection of historical cell site information for the period of July 2, 2013 through July 16, 2013 and real-time cell site information for the period of July 17, 2013 through September 15, 2013 for telephone number (910) 224-7406 – a cellular phone subscribed to and used by Defendant.

In his application, Officer Moore initially represented that the data sought from the pen/trap devices was "relevant and material to an ongoing criminal investigation" regarding "Illegal Gambling." 1st App. at 2 [DE 393-1]. In discussing the factual basis for the requested pen/trap order, however, Officer Moore explained that the CCSO was conducting an investigation into a crack cocaine trafficking organization. *Id.* Pursuant to this investigation, explained Officer Moore, the CCSO learned the subject associated with phone number (910) 224-7406 was involved in the trafficking of crack cocaine as well as the smuggling of bulk cash proceeds derived from the sale and distribution of crack cocaine. *Id.* at 4. Officer Moore stated further that based on the CCSO's investigation – including controlled buys, surveillance and multiple search warrants – Defendant was currently and had been in the past a major contributor to the sale and distribution of crack cocaine in the North Carolina counties of Cumberland, Harnett and Sampson. *Id.* Officer Moore also advised that Defendant had used the target telephone to coordinate the sale and distribution of crack cocaine and the transportation of proceeds from the sale of crack cocaine. *Id.* at 5. Finally, Officer Moore stated that just days prior to the application date, the target telephone had called a telephone number associated with a kilogram level cocaine distributer within the North Carolina. *Id.*

### B. March 11, 2014 Application & Pen/Trap Order

On March 11, 2014, upon an application submitted by Officer Moore, a state court judge entered an order authorizing the CCSO to install and use a pen/trap device for the collection of historical cell site information for the period of February 10, 2014 through March 10, 2014 and real-time cell site information for the period of March 11, 2014 through May 10, 2014 for telephone number (910) 818-0376 – a cellular phone subscribed to and used by Defendant.

Officer Moore explained generally that the CCSO was conducting a criminal investigation in reference to "Narcotics Trafficking" and that the pen/trap data retrieved from the target telephone (910-818-0376) would be relevant to this investigation. 2d App. at 2 [DE 393-2]. Officer Moore then provided numerous details regarding the investigation of the DTO, which was initiated in September 2000. *Id.* at 4. The details included the following: (1) the DTO provided supplied crack cocaine to Cumberland County, N.C. and part of Harnett County, N.C.; (2) Lemont Webb and Defendant served as the leaders of the DTO; (3) the DTO used four residences located on Godwin Falcon Road in Cumberland County, North Carolina (all owned by Harry Myles, Sr.), for selling crack cocaine and for storing the sale proceeds; (4) Defendant and Webb used the home located at 8206 Godwin Falcon Road solely for crack cocaine distribution purposes 24 hours a day, 365 days a year and distributed one to two kilograms of crack cocaine per week; (5) the people selling narcotics out of the 8206 home worked for Defendant and Webb; (6) the DTO used a shed located at 8212 Godwin Falcon Road (Webb's residence) to manufacture or cook crack cocaine; and (7) the DTO used residences of Harry Myles, Sr. (8171 Norris Road, North Carolina) and Defendant (139 Bears Lane, Dunn, North Carolina) as stash houses for money and illegal narcotics. *Id.* at 4-6.

The investigation of the DTO included the use of search warrants (13), controlled buys (17) and undercover purchases (4). *Id.* at 4. Law enforcement also relied on information provided by confidential informants and two cooperating defendants. The first cooperating defendant stated that he supplied Webb approximately 2 ounces of powder cocaine once a week, every week from 2003 to early 2005, and 9 ounces of powder cocaine every two weeks from early 2005 until October 2012. *Id.* at 7. The second cooperating defendant provided the following information: (1) he first sold crack cocaine to Webb in September 2008; (2) he sold cocaine to Webb on a regular basis from January 2009 until March 2010; (3) he delivered cocaine to Webb's residence (8212 Godwin Falcon Road) or to unnamed locations on Highway 82 in Dunn, North Carolina or on Bears Lane in Dunn, North Carolina (the road on which Defendant resided); and (4) Webb sold cocaine out of a home located on Bears Lane. *Id.* at 8-9. Both cooperating defendants advised that Webb had made over one million dollars selling cocaine and crack cocaine in and around the Cumberland and Harnett County areas of North Carolina. *Id.* at 10.

Finally, Officer Moore explained that phone records indicated Webb and his associates were in phone contact with phones associated with known local narcotics distributors (Durham and Greensboro, North Carolina) as well as out-of-state narcotics distributors (Illinois, Virginia and Ohio). *Id.* at 10.

**C.     May 14, 2014 Application & Pen/Trap Order**

On May 14, 2014, upon an application submitted by Officer Moore, a state court judge entered an order authorizing the CCSO to install and use a pen/trap device for the collection of the historical cell site information for the period of May 10, 2014 through May 13, 2014 and real-time cell site information for the 60-day period of May 14, 2014 through July 13, 2014 for

telephone number (910) 818-0376) – a cellular phone subscribed to and used by Defendant.

Officer Moore again explained that law enforcement was conducting a criminal investigation in reference to "Narcotics Trafficking" and that the pen/trap data retrieved from the target telephone (910-818-0376) would be relevant to this investigation. 3d App. at 2 [DE 393-3]. In addition to including the information provided in the earlier applications, Officer Moore stated continued surveillance of Defendant and Webb confirmed that (1) Defendant and Webb continued to hold leadership roles in the DTO, and (2) the DTO continued to distribute crack cocaine daily from the home at 8206 Godwin Falcon based on vehicular traffic visiting the home "at all times of day and night" for periods not exceeding two minutes.[4] 3d App. at 10. Officer Moore also noted that continued phone record analysis during "the last two months" indicated a possible new source of supply in the Las Vegas, Nevada area. *Id.* This information confirmed a confidential informant's statement that Defendant and Webb "were traveling" to this area to purchase large quantities of cocaine. *Id.* Finally, Officer Moore explained law enforcement continued to identify possible co-conspirators and to confirm continued contact between Defendant, Webb and known narcotics traffickers.

**D. July 18, 2014 Application & Pen/Trap Order**

On July 18, 2014, upon an application submitted by Officer Moore, a state court judge entered an order authorizing the CCSO to install and use a pen/trap device for the collection of historical cell site information for the period of July 14, 2014 through July 17, 2014 and real-time cell site information for the period of July 18, 2014 through September 16, 2014 for telephone number (910) 818-0376 – a cellular phone subscribed to and used by Defendant.

---

[4] Officer Moore indicated this type of activity was "indicative of a residence used solely for the purpose of distributing user amounts of illegal narcotics, in this case crack cocaine." 3d Aff. at 10 [DE 393-3].

Officer Moore again explained that law enforcement was conducting a criminal investigation in reference to "Narcotics Trafficking" and that the pen/trap data retrieved from the target telephone (910-818-0376) would be relevant to this investigation. 4th App. at 2 [DE 393-4]. In addition to including the information provided in the earlier applications, Officer Moore provided details of two attempted drug purchases on June 24, 2014 and July 1, 2014. *Id.* at 8. During the June 2014 attempt, a confidential source of information ("CSI") tried to purchase a "dub" (i.e., $20 worth of crack cocaine) from Antoine at the 8206 home. 4th App. at 8 [DE 393-4]. Antoine, however, ordered the CSI to "get the hell out. I don't know you." *Id.*

Regarding the July 2014 attempt, Officer Moore stated that a CSI placed a consensually recorded phone call to Antoine Myles at the (910) 818-0376 telephone number and requested "a sixteenth or a ball or something" of powder cocaine. *Id.* Antoine responded, "Let me make a few calls and ya I can do that," and then advised he would call the CSI "in a couple of hours." *Id.* at 8-9. Office Moore provided no further information regarding this phone call. Officer Moore explained, however, that based on the conversation, his experience and information provided by the CSI, Defendant agreed to sell a quantity of powder cocaine or illegal narcotics. *Id.* at 9.

Finally, Officer Moore explained that phone toll records indicated that during June 2014, Defendant contacted Webb 363 times at the phone number (910) 658-5720. *Id.* He stated further that in light of the information provided to date, he believed both Defendant and Webb continued to operate and oversea the DTO based in the Cumberland and Harnett counties. *Id.*

### III.  APPLICABLE LAW

The privacy concern raised in the instant motion is an inevitable result of advances in cell phone technology.[5] The third-party pen/trap orders here are similar to those issued nationwide, thereby giving rise to a significant, and at times divergent, body of case law relating to cell phone records and cell site location information. Before discussing the instant motion, a brief summary of the relevant statutes and the legal standards governing access to cell phone data is in order.

**A.  Cellphone Technology**

By way of necessary background, cellular telephone networks function by transmitting and receiving signals to and from cell towers placed throughout their coverage areas. "A cell phone connects to a service provider's cellular network through communications with cell sites, occurring whenever a call or text message is sent or received by the phone." *United States v. Graham*, 796 F.3d 332, 343 (4th Cir.), *reh'g en banc granted*, 624 F. App'x 75 (4th Cir. 2015). As a cell phone and its user move from place to place, the cell phone's signal is sent automatically to the tower that provides the best reception. *See id.* "Whenever a cell phone makes or receives a call, sends or receives a text message, or otherwise sends or receives data, the phone connects via radio waves to an antenna on the closest cell tower," generating cell site location information ("CSLI"). *In re Tel. Info. Needed for a Crim. Investigation*, 119 F. Supp. 3d 1011, 1014 (N.D. Cal. 2015). "The resulting CSLI includes the precise location of the cell tower and cell site serving the subject cell phone during each voice call, text message, or data

---

[5] Indeed, the Supreme Court presciently warned years ago the potential impact on privacy rights in advances in electronic communications generally. *See Berger v. New York*, 388 U.S. 41, 62 (1967) ("[T]he fantastic advances in the field of electronic communication constitute a great danger to the privacy of the individual; . . . indiscriminate use of such devices in law enforcement raises grave constitutional questions under the Fourth and Fifth Amendments . . . .").

connection." *Id.* Accordingly, cellular telephone companies typically have the technical means to keep track of and store the cell phone tower that is receiving the signal of a cell phone at any given point in time. *See Graham*, 796 F.3d at 343 ("When the phone connects to the network, the service provider automatically captures and retains certain information about the communication, including identification of the specific cell site and sector through which the connection is made."). In fact, by a process of triangulation from various cell towers, law enforcement is able to track the movements of the target phone, and thus pinpoint the location of a person using that phone. *In re Pen Register & Trap/Trace Device with Cell Site Location Auth.*, 396 F. Supp. 2d 747, 751 (S.D. Tex. 2005); *see In re Tel. Info. Needed for a Crim. Investigation*, 119 F. Supp. 3d at 1015 (explaining "it has become ever more possible for the government to use CSLI to calculate a cell phone user's locations with a precision that approaches that of GPS") (internal quotation marks omitted).

## B. Statutory Framework

The government may lawfully acquire many different types of data from electronic devices like cell phones, from as little as a phone's subscriber information to as much as the contents of conversations between two people. Currently, federal statutes authorize four means of collecting such data: pen register and trap-and-trace devices, access to stored communications, the use of tracking devices, and real-time communication intercepts (i.e., "wiretaps"). Law enforcement's access to this data is governed by the Electronic Communications Privacy Act of 1986 ("ECPA"), 18 U.S.C. §§ 2701-2711. *See* Pub. L. No. 99-508, 100 Stat 1848 (1986). The ECPA is divided into three titles – Titles II and III are pertinent to this case.[6]

---

[6] Title I of the ECPA governs mobile tracking devices, *see* 18 U.S.C. § 3117, and also amended the 1968 wiretap statute (Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520). Both § 3117 and the wiretap statute are governed by the probable cause standard. *See* 19 U.S.C. § 3117(a); FED. R.

The Stored Communications Act, which constitutes Title II of the ECPA, governs access to stored communications and transaction records. *See* 18 U.S.C. §§ 2701-2712. Relevant here, § 2703 authorizes government access to stored communications or transaction records in the hands of third-party service providers. There are three categories of information, each with differing access requirements: (a) contents of wire or electronic communications in electronic storage; (b) contents of wire or electronic communications in a remote computing service; and (c) subscriber records concerning electronic communication service or remote computing service. 18 U.S.C. § 2703(a)-(c). The first two categories of content information generally require either a search warrant under Rule 41 of the Federal Rules of Criminal Procedure[7] or notice to the subscriber or customer. The third category of information – subscriber records – may be obtained by a court order upon proof of "specific and articulable facts showing . . . reasonable grounds to believe . . . the records or other information sought, are relevant and material to an ongoing criminal investigation." *Id.* § 2703(d).

Title III of ECPA applies to law enforcement applications for two forms of telephone-based surveillance: pen registers and trap-and-trace devices. *See* 18 U.S.C. §§ 3121-27 ("Pen Register Statute" or "PRS"). A pen register is a device that records the numbers dialed for outgoing calls made from the target phone. 18 U.S.C. § 3127(3). A trap-and-trace device captures the numbers of calls made to the target phone. *Id.* § 3127(4). Because a person has no reasonable expectation of privacy in the telephone number he dials, *see Smith v. Maryland*, 442 U.S. 735 (1979), a law enforcement officer need only certify that information likely to be

---

CRIM. P. 41(b)(4); 18 U.S.C. § 2518(3).

[7] Under Rule 41, the government must make a showing of probable cause. *See In re United States ex rel. an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d 526, 566 (D. Md. 2011) (noting Rule 41 "is the codified expression of Fourth Amendment law").

obtained by the pen register or trap-and-trace device "is relevant to an ongoing criminal investigation."[8] *Id.* § 3122(b)(2). Upon that certification, the court must enter an *ex parte* order. *Id.* § 3123(a)(1), (2). Court orders allowing the use of pen registers and trap-and-trace devices are limited in duration – they cannot exceed sixty days – but may be extended in the event of an additional application by the government.[9] *Id.* § 3123(c).

In sum, the standards law enforcement must meet for obtaining cell site information (and the possible basis for authority for each) are: (1) obtaining a warrant for disclosure of the information pursuant to Fed. R. Crim. P. 41 upon a showing, through sworn affidavit, that probable cause exists to believe that what is to be seized is evidence of a crime; (2) obtaining a court order pursuant to sections 2703(c) and (d) of the SCA upon a showing of "specific and articulable facts"[10] that the information sought is "relevant to and material to an ongoing criminal

---

[8] The wording of the North Carolina pen register statute is virtually verbatim with its federal counterpart. *See* N.C. Gen. Stat. § 15A-262(2)(b) (requiring the application to provide the identity of the law enforcement officer making the application, the law enforcement agency conducting the investigation and a "certification by the applicant that the information likely to be obtained is *relevant to an ongoing criminal investigation* being conducted by that agency") (emphasis added) The issuance of a pen/trap order under North Carolina law requires that a state court judge make the following findings:

(1) There is reasonable suspicion to believe that a felony offense, or a Class A1 or Class 1 misdemeanor offense has been committed;
(2) There are reasonable grounds to suspect that the person named or described in the affidavit committed the offense . . . ; and
(3) The results [of employing pen/trap devices] will be of material aid in determining whether the person named in the affidavit committed the offense.

*Id.* § 15A-263(a).

[9] In 1994, Congress passed the Communications Assistance of Law Enforcement Act ("CALEA"), 47 U.S.C.A. §§ 1001-1010, which delineates a telecommunications carrier's duty to cooperate in the interception of communications for law enforcement purposes. While CALEA was designed "to preserve the government's ability . . . to intercept communications involving advanced technologies," *U.S. Telecom Ass'n v. F.C.C.*, 227 F.3d 450, 454 (D.C. Cir. 2000) (quoting H.R. rep. No.103-827, pt. 1, at 9 (1994), it specifically prohibits the government from acquiring the physical location of a subscriber based solely on the PRS. 47 U.S.C. § 1002(a)(2) (providing "information acquired solely pursuant to the authority for pen registers and trap and trace devices ... shall not include any information that may disclose the physical location of the subscriber").

[10] *See United States v. Shah*, 2015 U.S. Dist. LEXIS 826, at *13-14 (E.D.N.C. Jan. 6, 2015) ("Legislative history behind section 2703(d) states that the standard used for such orders is 'higher than a subpoena, but not a

investigation," 18 U.S.C. § 2703(d); and (3) obtaining a pen register pursuant to § 3122(a)(2) of the Pen/Trap Statute upon certification that the information sought "is relevant to an ongoing criminal investigation," *id.* § 3122(b)(2); accord N.C. Gen. Stat. § 15A-262(2)(b).

## C. Historical vs. Real-Time Cell Site Location Data

Cell site data is referred to as either "historical" or "real-time" (or "prospective") data.[11] Historical cell site data refers to the acquisition of cell site data for a period retrospective to the date of the order. That is, the data shows where the cell phone has been located at some point in the past. Real-time data, on the other hand, refers to the acquisition of data for a period of time going forward from the date of the order. That is, it shows where the phone is presently located through the use of GPS or precision location data.

Disagreements exist as to whether applications for cell site data implicate a Fourth Amendment privacy interest.[12] To present a viable Fourth Amendment claim, a defendant must have "a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). As to whether cellular telephone users have a reasonable expectation of privacy in data about their historical movements such that the government's request for the information amounts to a "search" subject to the Fourth Amendment's warrant requirement, the majority of

---

probable cause warrant.'") (quoting Senate Report No. 103-402, at 31 (1994); H.R. Rep. No. 103-827, pt. 1 at 31 (1994)).

[11] Courts generally use both "real-time" and "prospective" interchangeably.

[12] The Fourth Amendment protects against unreasonable searches and seizures. To comply with it, law enforcement personnel generally must obtain a warrant, supported by probable cause, from a neutral and detached judicial officer before searching people or their houses, papers, and effects for evidence of criminal wrongdoing. *Riley v. California*, 134 S. Ct. 2473, 2482 (2014); *Kentucky v. King*, 563 U.S. 452, 459 (2011). These requirements "guarantee[] the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their discretion." *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 613-14 (1989) (quotation omitted). Searches and seizures conducted without a warrant are "presumptively unreasonable." *King*, 563 U.S. at 459. Nevertheless, because "the ultimate touchstone of the Fourth Amendment is reasonableness," the warrant requirement is subject to several exceptions. *Id.* (internal quotation marks omitted).

federal courts have held such users do not.[13] *See United States v. Davis*, 785 F.3d 498, 511 (11th Cir. 2015); *United States v. Guerrero*, 768 F.3d 351, 359-60 (5th Cir. 2014); *United States v. Jones*, 908 F. Supp. 2d 203, 211 (D.D.C. 2012); *In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to Gov't*, 620 F.3d 304, 307-08 (3rd Cir. 2010); *see also In re Application of the U.S.A. for an Order Pursuant to 18 U.S.C. 2703(c), 2703(d) Directing AT & T, Sprint/Nextel, T-Mobile, Metro PCS, Verizon Wireless*, 42 F. Supp. 3d 511, 517 (S.D.N.Y. 2014) (collecting more cases). Relying on the rules regarding third party/business records, as provided under *United States v. Miller*, 425 U.S. 435, 443 (1976) and *Smith*, these courts reason that no expectation of privacy applies because cell phone users voluntarily convey the cell site location data to their providers. Thus, under the majority rule, obtaining this information requires a showing of less than probable cause. A divided panel of the Fourth Circuit Court of Appeals, however, recently held to the contrary. *United States v. Graham*, 796 F.3d 332 (4th Cir. 2015); *see also In re Tel. Info. Needed for a Crim Investigation*, 119 F. Supp. 3d 1011 (N.D. Cal. July 29, 2015).

With respect to "real-time" location data, however, the majority of federal courts that have considered the issue have concluded such information may only be obtained pursuant to a warrant supported by probable cause. *In re App. of U.S. for an Order Authorizing Disclosure of Location Information*, 849 F. Supp. 2d 526, 539-42 (D. Md. 2011); *see also United States v.*

---

[13] This majority holding has implications on a defendant's ability to successfully argue for suppression of data obtained under the SCA. This is because suppression is not a remedy for a violation of the SCA. The Act provides a narrow list of remedies, and – unlike the wiretap statute, *see* 18 U.S.C. § 2515 – suppression is not among them. 18 U.S.C. § 2707(b) (listing "appropriate relief" as "equitable or declaratory relief," "damages," and "reasonable attorney's fee and other litigation costs reasonably incurred"); 18 U.S.C. § 2708 (providing that the "remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter"). "The availability of the suppression remedy for . . . statutory, as opposed to constitutional, violations . . . turns on the provisions of [the statute] rather than the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights." *United States v. Clenney*, 631 F.3d 658, 667 (4th Cir. 2011) (quoting *United States v. Donovan*, 429 U.S. 413, 432 n.22 (1977)).

*Espudo*, 954 F. Supp. 2d 1029, 1035 (S.D. Cal. 2013) (collecting cases); *but see In re Application of the United States for an Order for Prospective Cell Site Location Information on a Certain Cellular Telephone*, 460 F. Supp. 2d 448 (S.D.N.Y. 2006) (warrant not required); *In re Application of the United States for an Order (1) Authorizing the Installation and Use of a Pen Register and Trap and Trace Device, and (2) Authorizing Release of Subscriber and Other Information*, 433 F. Supp. 2d 804 (S.D. Tex. 2006) (same).

## IV. DISCUSSION

Defendant challenges the issuance of each of the pen/trap orders on two bases: (1) the applications were unsupported by probable cause thereby violating his Fourth Amendment privacy rights; and (2) the orders failed to comply with the North Carolina pen register statute. The government argues that the applications complied with both state and federal law and contained sufficient facts to establish a probable cause basis for each of the pen/trap orders to issue. Alternatively, argues the Government, even if the applications did not establish probable cause, the evidence should not be suppressed because the CCSO relied in good faith on the applications.

At the outset, the court notes the parties spend a great deal of their briefing arguing about whether the state court judge followed the North Carolina PRS and the standard that law enforcement must meet to obtain an order thereunder. It is unnecessary to resolve this dispute because the current state of the law in this area compels the conclusion that the acquisition of CSLI – whether historical or prospective – is governed by the probable cause standard.

Here, the Government obtained historical and real-time cell site data not through a search warrant but rather by securing a court order. The relevant inquiry, then, is whether law enforcement officers violated the Fourth Amendment when they obtained Defendant's cell site

data pursuant to a state court order.

> The Fourth Amendment provides as follows:
>
> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The words of the second clause of the Fourth Amendment, referred to as the "Warrant Clause," are "precise and clear" and "require only three things" for a valid search warrant:

> First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense. Finally, warrants must particularly describe the things to be seized, as well as the place to be searched.

*Dalia v. United States*, 441 U.S. 238, 255 (1979) (citations and internal quotation marks omitted). The state court orders at issue here easily satisfy the first and third requirements of the Warrant Clause. The orders were issued by a neutral, disinterested state superior court judge, and they particularly describe the information to be seized from a specific cell phone. Defendant makes no argument to the contrary.

Turning to the third requirement, he pen/trap orders were issued pursuant to a probable cause finding. In particular, each pen/trap order begins as follows:

> This matter, coming on to be heard and having been heard before the undersigned Superior Court Judge and finding specific and articulable facts showing that Probable Cause exists pursuant to North Carolina General Statute 15A-262, G.S. 15A-263, Rule 41(d)(1), Federal Rule Criminal Procedure and Title 18, United States Code (U.S.C.), 2703(d) . . . .

[DEs 393-1 at 8, 393-2 at 14, 393-3 at 13, 393-4 at 12] (emphasis omitted). The parties disagree however as to whether each of the order's supporting applications articulated sufficient facts to

support a probable cause determination. Probable cause exists when "a practical, common-sense" evaluation of "all the circumstances set forth in the affidavit" demonstrates "a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* A judge's "determination of probable cause should be paid great deference by reviewing courts." *Id.* at 236.

In the first application (July 17, 2013), Officer Moore explained that the CCSO was investigating a crack cocaine drug trafficking organization. Through various investigative techniques – including search warrants, surveillance and controlled buys – the CCSO learned that Defendant played a major role in the DTO's activities. In particular, Defendant sold and distributed crack cocaine in three different North Carolina counties and coordinated the sales and distribution thereof via the target cell phone. Defendant argues these facts are "conclusory." The court disagrees. These facts demonstrate that Defendant was the user of the target cell phone and was involved in a DTO under investigation. Nothing more was needed to obtain the information sought by the government.[14] *See Gates*, 462 U.S. at 231 (stating "the probable-cause standard is . . . a practical, nontechnical conception"). The court's review of the remaining applications leads to the same finding. Each subsequent application set forth allegations, based on various investigative techniques, indicating Defendant's involvement with the DTO and his use of the target cell phone in aiding the activities of the DTO.

In sum, the state court judge had a "substantial basis" for concluding that probable cause existed when he issued the four pen/trap orders authorizing the disclosure of Defendant's cell phone data because the information sought "would uncover evidence of wrongdoing." *Gates*, 462 U.S. at 236. Consequently, each pen/trap order at issue here effectively served as a warrant

---

[14] The "illegal gambling" reference in the July 2013 application, while indicative of the applicant's failure to adequately proofread his work, has no impact on the court's finding that the application established probable cause.

that complied with the three requirements of the Warrant Clause of the Fourth Amendment and, therefore, no further authorization was required for the CCSO to obtain and inspect Defendant's historical and real-time CSLI.

Given the court's ruling, there is no need to address the government's alternative argument that the pen/trap orders are saved by the *Leon* good faith exception. Nevertheless, considering the unsettled nature of this area of law, the court finds alternatively that the pen/trap evidence is admissible under the good faith exception.

"When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). "This prohibition applies as well to the fruits of the illegally seized evidence." *United States v. Calandra*, 414 U.S. 338, 347 (1974). As with any remedial device, application of the exclusionary rule properly has been restricted to those situations in which its remedial purpose is effectively advanced." *Krull*, 480 U.S. at 347. This restriction has led the Supreme Court to articulate certain exceptions to the exclusionary rule, including the good faith exception first articulated in *United States v. Leon*, 468 U.S. 897 (1984).

Under this exception, the exclusionary rule does not bar evidence obtained by officers acting in objectively reasonable reliance on a search warrant that is subsequently invalidated. *Leon*, 468 U.S. at 918-21. Under that circumstance, absent "an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 926; *Graham*, 796 F.3d at 362 (stating law enforcement may rely on "(1) an enacted statute, unless that statute is clearly

unconstitutional; (2) a search warrant or other court order issued by a neutral magistrate, unless issuance of the order is clearly defective; or (3) binding appellate precedent") (citations omitted).

Here, there is no reason to find that the state court judge abandoned his detached and neutral role, that Officer Moore was dishonest or reckless in preparing his application, or that Officer Moore lacked an objectively reasonable belief that probable cause existed. *See Graham*, 796 F.3d at 362 (finding government entitled to good-faith exception because in seeking historical CSLI, it "relied on the procedures established in the SCA and on two court orders issued by magistrate judges in accordance with the SCA"). The law regarding cell phone searches is rapidly evolving. Indeed, at the time the pen/trap orders were signed, no Fourth Circuit precedent existed regarding historical or real-time CSLI – just conflicting district court decisions on the subject. *See United States v. Jones*, 908 F. Supp. 2d 203, 215 (D.D.C. 2012) (stating "reasonable minds may differ as to whether § 2703 permits law enforcement to seek authorization for prospective cell-site information"). In sum, Defendant fails to offer any evidence to suggest that Officer Moore did not rely upon the pen/trap orders in good faith.

## V. CONCLUSION

For the foregoing reasons, Antoine Myles' Motion to Suppress Evidence from Pen Registers and Related Instruments [DE 393] is DENIED.

SO ORDERED.

This the 25 day of April, 2016.

*James C. Fox*
**JAMES C. FOX**
Senior United States District Judge